PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                              No. 00-4754

OTIS LEE WEAVER, JR.,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CR-99-67-PJM)

Argued: November 2, 2001

Decided: February 28, 2002

Before NIEMEYER and LUTTIG, Circuit Judges, and
Frank J. MAGILL, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

Affirmed by published opinion. Senior Judge Magill wrote the opinion, in which Judge Niemeyer and Judge Luttig joined.

## COUNSEL

**ARGUED:** Daniel William Stiller, Assistant Federal Public Defender, Greenbelt, Maryland, for Appellant. Gina Laurie Simms, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Greenbelt, Maryland, for Appellee. **ON BRIEF:** James

Wyda, Federal Public Defender, Greenbelt, Maryland, for Appellant. Stephen M. Schenning, United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Greenbelt, Maryland, for Appellee.

## OPINION

MAGILL, Senior Circuit Judge:

On February 22, 1999, a federal grand jury sitting in Maryland returned a three-count indictment charging Otis Lee Weaver, Jr., with bank robbery pursuant to 18 U.S.C. § 2113(a)(f), in connection with three robberies that occurred on December 11, 1997, January 29, 1998, and March 5, 1998, in Maryland. On August 1, 2000, the case went before a jury. On August 15, 2000, the jury returned its finding of guilty on all three counts charged in the indictment. Weaver was sentenced to 110 months imprisonment and three years supervised release and required to pay $8168 in restitution and three $100 special assessments. This appeal follows.

In particular, Weaver appeals a decision of the district court denying his motion to suppress evidence that was obtained as a result of a consensual encounter between himself and law enforcement officials. Weaver also appeals the district court's admission of certain "other crimes" evidence pursuant to Rule 404(b) of the Federal Rules of Evidence. Weaver's final contention is that the district court violated his due process rights at trial by "assisting" the prosecution, warranting a new trial. We reject Weaver's claims and accordingly affirm the district court.

I.

The underlying facts are basically undisputed. The first robbery charged in the indictment occurred on Thursday, December 11, 1997, at a branch of the American Federal Savings Bank in Rockville, Maryland. At about 3:30 p.m., Cassandra Powell, the bank manager, saw a man, later identified as Weaver, enter the bank and survey his surroundings. Powell noticed that the man kept his right hand in his pocket as he approached Rama Dewan, a teller. Believing that a rob-

bery was taking place, Powell walked toward the robber holding up the keys to the teller drawer, signaling to him that she was the one person able to provide him access to the cash contained in the drawer. As Powell approached, the robber handed Dewan a white plastic bag and instructed Dewan in an angry, agitated tone to "give me the money" and to "put it in the bag." The robber also warned Dewan not to pull any alarms. After receiving the keys from Powell, Dewan opened the drawer and put approximately $2000 into the bag and handed the bag back to the man, who then walked out of the bank without incident.

When the police arrived at the bank after the robbery, Powell and Tammy Tulloch, another bank employee, each described the robber. Powell described the robber as a thin black male, approximately six feet tall and wearing a navy knit cap, a burgundy Tommy Hilfiger windbreaker with cursive writing on it, and baggy blue jeans. Tulloch described the robber as a dark-complected young black male, skinny, weighing 140 to 150 pounds, and wearing a dark knit cap, a burgundy pullover with thin white cursive writing, and baggy blue jeans. After reviewing photos of Weaver in July of 1998, both Tulloch and Powell identified Weaver as the robber.[1]

The second robbery took place at the same Rockville, Maryland bank on Thursday, January 29, 1998, at approximately 2:30 p.m., when a man, later identified as Weaver, walked into the bank, approached Dewan, handed her a brown paper bag, and demanded money. As the robber approached Dewan, he kept his hand in his pocket. Both Dewan and Erin Funk, the bank manager, thought that the man had a gun. The robber, once again, spoke in a loud and agitated tone, and demanded that Dewan give him the money from the drawer. Dewan opened the drawer and put about $2000 into the bag. The robber took the money and left without incident.

At trial, Dewan was unable to identify Weaver as the robber, nor could she identify him when shown a photo array. In fact, Dewan thought the robber was a person other than Weaver. Funk described the robber to the police as being a young black male who was approx-

---

[1]Dewan, who testified that she was too scared to look at the robber's face during the incident, could not identify Weaver.

imately 5'10" tall and skinny, and as having a little and round head and as wearing a tannish-brown knit hat, large dark-framed eyeglasses, a dark blue jacket, dark jeans, and white sneakers. She identified Weaver as the robber from a photo array.

A third robbery occurred on Thursday, March 5, 1998, this time at a Maryland Federal Savings & Loan Branch in Bethesda, Maryland. On at least three or four occasions during the week before the robbery, bank employees Stephanie Yarmas, Catina Sapp, Rebecca Cooper, and Hilde Kochanek observed Weaver coming into the bank and asking for a loan application. Three of the employees testified that Weaver wore the same dirty jean jacket and blue jeans each time he came into the bank. Also, all four employees, on some occasions, recall Weaver wearing large eyeglasses.

At about 2:30 p.m., on March 5, a man, later identified as Weaver, entered the bank with a loan application in his hand. After handing the loan application to Yarmas, the individual placed a hand on her shoulder and put something that felt like a gun against her back. The robber directed Yarmas toward the teller line door and threatened to shoot her at one point. At that point, Sapp and Cooper helped Yarmas open the door. The robber then directed both Sapp and Cooper to empty the drawers into a white plastic shopping bag that he provided for them. Sapp, Yarmas, and Cooper all testified that during the robbery Weaver kept one of his hands in his jean jacket pocket. Both Sapp and Yarmas placed dye packs and bait money into the bag. When the robber received the money, he thanked the employees, told them to "have a nice day," and calmly left the bank.

When police responded at the bank, Sapp described the robber as a 25-year-old, medium-complected black man, about 5'5" tall, and weighing approximately 150 pounds. Sapp further described the robber as being unshaved and wearing a yellow and blue ski hat, brown eyeglasses, a blue jean jacket with dried mud on it, a red and white "Guess" shirt, jeans, and white sneakers. Cooper told the police that the robber wore a blue hooded sweatshirt, but at trial, more than two years after the robbery, she also recalled telling the police that the robber wore a jean jacket and was 5'5" tall. When shown photo arrays, Sapp and Cooper identified Weaver as the robber. At trial, Cooper, Sapp, and Yarmas identified Weaver in court as the robber.

After the three Maryland robberies, on June 10, 1998, Weaver, a black male standing about six feet tall and weighing 180 pounds, entered a branch of the First Union Bank in Springfield, Virginia, and robbed the bank.[2] Weaver was wearing a black Baltimore Ravens cap, large brown eyeglasses, navy blue sweat pants, and a navy and black flannel shirt. With one hand in his pocket, Weaver accosted a bank employee by pressing a hard object into her back and directing her to the teller area. Once at the teller area, Weaver pulled out a white plastic bag and told the teller to put the money into the bag or risk being shot. Weaver also told the teller not to put any bait money into the bag. Weaver made a similar demand of another teller, and after obtaining the bag containing approximately $1500, he told the tellers to "have a nice day" and walked out of the bank. This robbery was not charged in the indictment for the three Maryland robberies.

Seven days after the Virginia robbery, on June 17, 1998, Weaver was arrested in Virginia as a suspect in the Virginia robbery. That day, the authorities received a report about a suspicious individual at a bank whom the bank teller believed matched the description of the person on a "wanted poster" connected to the June 10 robbery. The teller's report described a short-haired black male, about six feet tall, weighing approximately 175 pounds, and wearing glasses and a baseball hat. Officer Eric Leeds was on duty about one hundred yards away from the location when he received the call. About five seconds later, Officer Leeds saw Weaver, whom he believed fit the description of the suspicious person. Notably, Officer Leeds had never seen the wanted poster in question, nor does it appear from the record that he had any prior knowledge of the robbery in question.

Officer Leeds, who was armed and in uniform, approached and made contact with Weaver. He asked Weaver if he could talk to him and Weaver responded affirmatively. Officer Leeds explained to Weaver that the police had received a call concerning a suspicious person, and that Weaver matched the description of that person. Leeds obtained Weaver's driver's license so that he could run a computer check to see if Weaver had any arrest warrants. After determining that there were no warrants for Weaver's arrest, but before Leeds returned

---

[2]This robbery constitutes the Rule 404(b) evidence that is at issue in this case.

Weaver's driver's license, Leeds asked Weaver if he would accompany him to a nearby bank. Weaver agreed and then Officer Leeds led Weaver to a nearby NationsBank to verify the bank teller's suspicions. Once at NationsBank, Leeds discovered that he had taken Weaver to the wrong bank.

Next, Officer Leeds, who was still in possession of Weaver's driver's license, asked Weaver if he would accompany him in his police cruiser to another bank. Once again Weaver agreed, and pursuant to standard police procedure Leeds patted down Weaver before he got into the cruiser. After driving about one hundred yards to the second bank, Leeds and Weaver met Officer Jones. Jones, who had also heard the report, began questioning Weaver about why he was there. While Weaver explained to Jones that he was there picking up job applications, Officer Nicolo arrived at the scene and told Jones that a woman inside the bank had just identified Weaver as the subject depicted in the "wanted poster" in connection with the fourth robbery, which occurred at the First Union Bank in Springfield, Virginia. Officer Jones, who also believed that Weaver matched a photograph that he had seen the night before during roll call, remembered that the information given the night before mentioned the possibility of a gun. Out of concern for his and the other officers' safety, Officer Jones handcuffed Weaver and made a check for weapons. During the pat down, Officer Jones felt a "hard object" on Weaver and asked Weaver what he had in his pockets. Weaver's pockets contained a pair of large eyeglasses, a lighter, some keys, and a small quantity of marijuana. Upon finding the marijuana, Officer Jones told Weaver that he was under arrest. The police recovered the eyeglasses and took a photograph of Weaver, which was later used to show to witnesses of the other bank robberies. After viewing this photograph, five individuals, from all three Maryland robberies charged in the indictment, independently identified Weaver as the robber.

II.

Prior to trial, Weaver filed several motions, including a motion to suppress all evidence seized from his person, namely his "oversized" eyeglasses and the identification evidence. Following an evidentiary hearing, the Maryland district court denied Weaver's motion to suppress the eyeglasses and identification. The district court ruled that

Weaver's Fourth Amendment rights were not violated because the entire encounter between Weaver and the police was consensual.

At trial, the government sought, over Weaver's objection, to introduce evidence relating to the bank robbery in Virginia, which Weaver committed, under Federal Rule of Evidence 404(b), i.e., "other crimes" exception. After an evidentiary hearing, the district court agreed with the government and allowed evidence relating to the Virginia bank robbery to go before the jury, on all three counts charged in the indictment, under Rule 404(b), as *modus operandi* evidence relevant to establishing identity.

Also at trial, the government attempted to establish the FDIC-insured status of the Maryland Federal Savings & Loan through the testimony of Hilde Kochanek, the branch manager of the Bethesda bank involved in the robbery charged in Count Three of the indictment. Over a defense objection and a motion to strike, Kochanek testified that, as of March 5, 1998, the funds in the bank were insured by the FDIC. On cross-examination, Kochanek admitted that her knowledge of FDIC coverage was premised on the presence of an FDIC symbol in the bank window and the presence of a certificate on the wall, and that she had no personal knowledge of the bank's insured status.

Following Kochanek's testimony, the district court asked the government what evidence it was offering to prove the FDIC-insured status of Maryland Federal. The court, noting that the bank's FDIC-insured status constituted an element of the offense that the government had to prove, said that it was not about "to let this case be tried on the basis of a technicality."[3] Accordingly, the court agreed to take a "longer lunch hour" in order to allow the government to obtain the necessary certification. However, the government was unable to obtain the documentation on such short notice, so the government requested a continuance so as to provide them an opportunity to obtain the certificate of insurability. Weaver's counsel strenuously objected, arguing that the trial judge had improperly injected himself

---

[3]The district court noted that "usually FDIC insurance is stipulated," and thus the court felt as though the government should be given an opportunity to obtain the proper certification to prove insurability.

into the trial by instructing the government on how to cure a "fatal defect" in its case.

The court disagreed, and granted the continuance. Additionally, the court explicitly refused to answer the government's questions regarding whether the evidence the government was going to offer, a certificate from the FDIC for American Federal Savings, would be sufficient to establish FDIC-insured status. The court answered, "I don't think I can answer your question directly . . . which is what do I think will be sufficient evidence? I mean I am not going to try your case for you." The court also permitted Weaver to have a standing objection to any witness or evidence relating to the bank's insured status. The trial continued that day, with the government introducing the FDIC certificate for American Federal Savings.

When the trial resumed ten days later, the government presented the testimony of Joseph Yohe who offered testimony and evidence of Maryland Federal's FDIC-insured status. Ultimately, the jury convicted Weaver on all three counts of the indictment, and Weaver was subsequently sentenced to 110 months imprisonment. The district court entered final judgment on October 19, 2000, and a timely notice of appeal was filed the next day. Our jurisdiction is premised upon 28 U.S.C. § 1291.

III.

We first address Weaver's argument that he was unreasonably seized for purposes of the Fourth Amendment when, as an interstate traveler, he accompanied a uniformed and armed police officer, who had retained his driver's license, into a police cruiser. In light of these facts, Weaver argues that the encounter between himself and Officer Leeds was not consensual. It follows, Weaver argues, that if he was in fact unreasonably seized, then all evidence that flows from this seizure should have been suppressed by the district court. *See Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963). The government, however, argues that the interaction between Officer Leeds and Weaver was consensual; therefore, the Fourth Amendment is not implicated. The trial court, ruling from the bench, agreed with the government's reasoning that because Weaver was in "no way impeded physically by holding his [identification] from him," and that because Weaver did

not ask for his driver's license back, "he was not in that sense detained." In reviewing the district court's denial of a pretrial motion to suppress evidence, we review the district court's factual findings for clear error, while all legal conclusions are reviewed de novo. *United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998).

The Fourth Amendment to the United States Constitution provides that the people shall "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const., amd. IV. The primary purpose of the Fourth Amendment is "'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *INS v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)). The Supreme Court has recognized three distinct types of police-citizen interactions: (1) arrest, which must be supported by probable cause, *see Brown v. Illinois*, 422 U.S. 590 (1975); (2) brief investigatory stops, which must be supported by reasonable articulable suspicion, *see Terry v. Ohio*, 392 U.S. 1 (1968); and (3) brief encounters between police and citizens, which require no objective justification, *see Florida v. Bostick*, 501 U.S. 429, (1991). The case before us falls into the latter category.

It is axiomatic that police may approach an individual on a public street and ask questions without implicating the Fourth Amendment's protections. *Bostick*, 501 U.S. at 434; *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion). Without such an ability, law enforcement officials would be neutralized to the point of being ineffective. Some contacts that start out as constitutional may, however, at some unspecified point, cross the line and become an unconstitutional seizure. We are tasked with determining whether the encounter at issue in this case, which without question started out as constitutional, somehow crossed the not-so-bright line and blossomed into an unconstitutional seizure.

Generally speaking, a "seizure" warranting protection of the Fourth Amendment occurs when, in view of the totality of the circumstances surrounding the "stop," a reasonable person would not feel free to leave or otherwise terminate the encounter. *Sullivan*, 138 F.3d at 133; *United States v. Lattimore*, 87 F.3d 647, 653 (4th Cir. 1996) (en banc). "Because the test is an objective one, its proper application is

a question of law." *Sullivan*, 138 F.3d at 133. Circumstances where the citizen would feel free to go, but stays and has a dialogue with the officer, are considered consensual, and therefore do not implicate the Fourth Amendment. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Delgado*, 466 U.S. at 216. In applying the totality of the circumstances test, courts look to numerous factors including the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen. *See Bostick*, 501 U.S. at 437; *Michigan v. Chesternut*, 486 U.S. 567, 571-76 (1988); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Most important, for our present purposes, numerous courts have noted that the retention of a citizen's identification or other personal property or effects is highly material under the totality of the circumstances analysis. *See Royer*, 460 U.S. at 501; 4 Wayne R. LaFave, *Search & Seizure* § 9.3(a), at 103 n.74, (3d. ed. 1996) (collecting cases).[4]

---

[4]In *Royer*, writing for the plurality, Justice White noted:

> Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, *while retaining his ticket and driver's license* and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.

460 U.S. at 501 (emphasis added). Weaver argues that this language from *Royer* supports the categorical approach he advances. This is simply not true. Not only have more recent cases limited the effect of this language from *Royer*, *see Bostick*, 501 U.S. at 437 (emphasizing that "seizure" inquiry is based on a totality of the circumstances and that no one factor is dispositive), but the passenger in *Royer* was on his way to board an airplane and without his ticket he could not do so. This fact is critical in our determination, as will soon become apparent. Had Officer Leeds retained Weaver's bus ticket as he was about to board a bus, the result in this case might be different. But those facts are not before us, and we intimate no view on that issue.

Weaver, however, argues that this last factor should be dispositive under the totality of the circumstances analysis. We disagree.

Despite Weaver's suggestion, we expressly refuse to adopt a bright-line rule that when an officer retains an individual's identification beyond its intended purpose, in this case checking for outstanding warrants, the individual whose identification is retained is effectively seized for purposes of the Fourth Amendment. Time and again, the Supreme Court has noted that the inquiry into whether a police-citizen encounter is a "seizure" for purposes of the Fourth Amendment is determined by examining the totality of the circumstances, and no one factor is dispositive. *See Bostick*, 501 U.S. at 437; *Chesternut*, 486 U.S. at 571-76; *Mendenhall*, 446 U.S. at 554. When viewed objectively, the encounter between Weaver and Officer Leeds does not amount to a constitutionally prohibited "seizure." Our decisions in *Sullivan*, *Lattimore*, and *United States v. Rusher*, 966 F.2d 868 (4th Cir. 1992), support our conclusion.

In *Lattimore*, the en banc court found that under the totality of the circumstances no Fourth Amendment violation occurred in the context of a traffic stop. After issuing the defendant two citations and returning the defendant's driver's license, the officer asked the defendant whether there was any contraband in his car. The defendant responded in the negative, and then consented to the officer's request to search his car. That search uncovered contraband. The court held that under the totality of the circumstances the encounter was consensual. In reaching that conclusion, the court stressed the fact that the officer did not question the defendant "until after the officer had issued the citations and returned [the defendant's] driver's license." *Lattimore*, 87 F.3d at 653. In *Rusher*, we failed to find a Fourth Amendment violation where, following a routine traffic stop, a police officer asked the defendant if he had any illegal contraband. Once again, as in *Lattimore*, the officer returned the defendant's driver's license and told him that he was "free to go." *Rusher*, 966 F.2d at 872.[5] After doing this, the officer then asked the defendant if there was any-

---

[5]It should be noted that in a similar, albeit distinguishable, context, the Fourth Amendment does not require that a lawfully seized defendant be advised that he is "free to go" before his consent to search will be recognized as voluntary. *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996).

thing illegal in his car. After the defendant stated that no contraband was present, he consented to a search, which uncovered illegal drugs. Under those circumstances, the court found the officer's questions to be within the confines of the Fourth Amendment because the encounter between the defendant and the officer was consensual. *Id.* at 877. Finally, in *Sullivan*, we held that no Fourth Amendment violation occurred because the officer "did not question [the defendant] until after he had returned [his] license and registration, thus ending the traffic stop and affording [the defendant] the right to depart." 138 F.3d at 133.

To be sure, one common thread in *Sullivan*, *Lattimore*, and *Rusher* is that the searches occurred *after* the respective defendants had gotten their identification back. Thus, it is only logical to draw from these cases, as well as *Royer*, that the retention of a person's identification is an important factor in determining whether a "seizure" within the meaning of the Fourth Amendment occurred. While this fact may be important, under the totality of the circumstances, it surely is not dispositive. Rather, placing those cases in their proper context shows that there is a uniqueness to those cases that is lacking in the case before us.

*Sullivan*, *Lattimore*, and *Rusher* all occurred within the context of a routine traffic stop. In those situations, the retention of one's driver's license would have effectively seized the individual because it is illegal to drive without a license in one's possession. In the context of a traffic stop, if an officer retains one's driver's license, the citizen would have to choose between the Scylla of consent to the encounter or the Charybdis of driving away and risk being cited for driving without a license. That is, of course, no choice at all, and that is why, in those cases, the retention of one's license is a highly persuasive factor in determining whether a seizure occurred. *See, e.g.*, *United States v. Mendez*, 118 F.3d 1426, 1430 (10th Cir. 1997) (noting bright-line rule in the traffic stop context); *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) (same); *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990) (same); *United States v. Jefferson*, 906 F.2d 346, 349 (8th Cir. 1990) (same). In the case before us, no such choice exists.

Here, Weaver was a pedestrian and could have walked away from the encounter. Admittedly, doing so may have created an awkward

situation between Weaver and Officer Leeds, but awkwardness alone does not invoke the protections of the Fourth Amendment, particularly so when the test employed is an objective one. Unlike those situations that may occur in the traffic stop context, pedestrian encounters are much less restrictive of an individual's movements. In the context before us, Weaver could have refused to cooperate when Officer Leeds asked him for his identification. Indeed, the Supreme Court has "consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention of seizure." *Bostick*, 501 U.S. at 437 (citations omitted). Thus, had Weaver walked away from Officer Leeds, the officer would have been forced to end the encounter. *See United States v. Wilson*, 953 F.2d 116, 122-23 (4th Cir. 1991) (seizure found where officer persisted in questioning after passenger conveyed unwillingness to engage in further conversation with officer). Instead, Weaver chose to remain and acquiesced to Officer Leeds' requests for his identification and that he accompany him to the two banks in question. In fact, the facts presented to us clearly show that the encounter between Weaver and Officer Leeds cannot be described as anything but consensual.

Furthermore, the documentation in question, Weaver's driver's license, was not necessary to his continuing onward like the airplane tickets in *Royer*, or the driver's licenses in *Sullivan*, *Lattimore*, and *Rusher*. Weaver was traveling by bus, and therefore he could legally go about his business without his driver's license. *See United States v. Waksal*, 709 F.2d 653, 660 (11th Cir. 1983) (noting that defendant did not feel free to go when officers retained documents necessary for him to continue on his journey). While it is without question that a driver's license is one of the most valuable pieces of personal identification possessed by any citizen,[6] it does not logically follow that any time an officer retains someone's driver's license that such retention blossoms into an unconstitutional seizure. Under the totality of the circumstances, however, something more is required.

As noted above, in applying the totality of the circumstances test, we look at such factors as the time, place and purpose of the encoun-

---

[6]*See United States v. De La Rosa*, 922 F.2d 675, 683 (11th Cir. 1991) (Clark, J., dissenting).

ter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant. In the case before us, the record shows that although Officer Leeds was in uniform and armed, he at no point threatened Weaver or brandished his weapon, the encounter occurred in a public parking lot in the middle of the day, Officers Jones and Nicolo did not come onto the scene until after Weaver had agreed to accompany Officer Leeds to the bank in question, and the record is void of any indication that Weaver was anything but agreeable to Officer Leeds' request that he accompany him to the bank. Finally, Officer Leeds stood outside his squad car, next to Weaver, when he asked whether Weaver would accompany him to another bank and at no point was Weaver's license held in the police cruiser after the necessary check was completed. *See United States v. Analla*, 975 F.2d 119, 124 (4th Cir. 1992) (fact that license was not taken into squad car important in determining consensual nature of encounter). In light of these facts, Weaver was free at this point to request that his license be returned to him so that he could end the encounter. *Id.* For whatever reason, Weaver chose not to do this. Instead, Weaver chose to stay and have a dialogue with Officer Leeds and accompany him to the two banks in question. Under the totality of the circumstances, we are convinced that the encounter between Weaver and Officer Leeds was consensual and therefore does not implicate the Fourth Amendment.

To the extent that any of our sister circuits have adopted per se rules in this context, we respectfully decline to follow their example. In *United States v. Jordan*, a case on which Weaver heavily relies, the District of Columbia Circuit recognized that under the totality of the circumstances test "only in rare instances will any one factor produce an inexorable conclusion that a seizure has occurred." 958 F.2d 1085, 1086 (D.C. Cir. 1992). One such circumstance is the retention of one's driver's license. In *Jordan*, the court held that "'once the identification is handed over to police and they have had a reasonable opportunity to review it, if the identification is not returned to the detainee [it is] difficult to imagine that any reasonable person would feel free to leave without it.'" *Id.* at 1087 (quoting *United States v. Battista*, 876 F.2d 201, 205 (D.C. Cir. 1989)); *see, e.g.*, *United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir. 1983); *United States v.*

*Thompson*, 712 F.2d 1356, 1359 (11th Cir. 1983). In the immigration context, the Fifth Circuit found that the retention of one's alien registration card "significantly impaired" an individual's right to "consent" to a search. *United States v. Chavez-Villarreal*, 3 F.3d 124, 128 (5th Cir. 1993). In fact, the court noted that the officer's "retention of the green cards reinforced his authority" and therefore made actual consent improbable. *Id.* These approaches, we believe, are contrary to the Supreme Court's teachings in *Bostick* because they elevate one factor above all others in determining whether a seizure has occurred, and therefore we decline Weaver's invitation to follow them.

Because we hold that the encounter between Weaver and Officer Leeds was consensual, and therefore did not constitute a "seizure" within the meaning of the Fourth Amendment, it necessarily follows that any evidence that flowed from this encounter was not illegally obtained. Accordingly, we affirm the district court's denial of Weaver's motion to suppress.

IV.

Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith [but may] be admissible . . . [to show] identity." Fed. R. Evid. 404(b). Generally speaking, Rule 404(b) is a rule of inclusion. Accordingly, "other crimes" evidence will be admissible if it is relevant to some other issue besides character, it is both necessary and reliable, and its probative value outweighs its prejudicial effect pursuant to Rule 403. *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997). Under the plain language of Rule 404(b), "other crimes" evidence may be used to show identity. We review the admission of evidence for an abuse of discretion. *United States v. Haney*, 914 F.2d 602, 607 (4th Cir. 1990). A district court will not be found to have abused its discretion unless its decision to admit evidence under Rule 404(b) was arbitrary and irrational. *Id.*

To properly answer the question before us, we need not discuss the merits of Weaver's claims because the admission of the evidence was harmless. Evidentiary rulings are subject to review for harmless error. *See* Fed. R. Crim. P. 52(a). Such rulings will be found harmless if we

are able to conclude, "'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997) (quoting *United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995)). Here, as the government correctly points out, the evidence was harmless in light of the overwhelming evidence against the defendant.

In the case before us, five witnesses independently identified Weaver in a photo array and again in court, while two others identified him only in court. In total, seven witnesses identified Weaver as the robber. Furthermore, there were numerous photographs taken from video images showing Weaver, which corroborated witness accounts of the robberies. Because there was more than enough evidence to prove identity even without the evidence in question, its admission was harmless. Additionally, the introduction of the evidence was harmless because "it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty absent this testimony." *United States v. McMillon*, 14 F.3d 948, 955 (4th Cir. 1994) (citing *United States v. Hasting*, 461 U.S. 499 (1983)). In accordance with *McMillon*, which held inadmissable Rule 404(b) evidence to be harmless, we hold that the admission of the evidence pertaining to the June 10 robbery was harmless, and therefore the jury's verdict should not be disturbed.

V.

Finally, this court reviews a party's allegation that the district court's behavior deprived that party of his or her due process right to a fair trial for an abuse of discretion. *United States v. Castner*, 50 F.3d 1267, 1272 (4th Cir. 1995). To be sure, district courts have a duty to conduct a jury trial in an impartial manner. *Id.* District courts have a duty to avoid creating even the slightest appearance of partiality and must refrain from repeated intervention on the side of one of the parties. *Id.* They are also charged with exercising reasonable control over the presentation of the evidence, so as to ensure that the truth may be effectively determined. *Id.* In doing so, a district court must take great pains to avoid the appearance that it is usurping "the role of either the prosecutor or the defendant's counsel." *United States v. Parodi*, 703 F.2d 768, 776 (4th Cir. 1983). Should the district court be unable to

comply with these requirements, a new trial is required. *Id.* (citing *United States v. Robinson*, 635 F.2d 981, 984 (2d Cir. 1980)).

Weaver argues that his Count Three conviction was obtained in derogation of his due process rights because of the "district court's uninvited rescue of the Government's fatally defective proof" relating to that count. The record, however, does not support this proposition. As the government correctly points out, the district court did not tell the government how to prove its case, nor did it act as an advocate on behalf of the government. All the court did was fulfill its duty under the Rules of Evidence. Its actions surely did not exhibit "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994) (in the context of a recusal motion). All the court did was to inform the government that it needed to provide a verifying document on the issue of insurability and then extend them the time necessary to obtain such documentation.[7] In fact, the court, when asked, purposefully avoided commenting on what type of evidence would be sufficient: "I don't think I can answer your question directly . . . which is what do I think will be sufficient evidence? I mean I am not going to try your case for you." Therefore, we conclude that the district court did not abuse its discretion when it told the government that it needed to provide a certificate of insurability in order to show proof of insurability and then provide the government with the necessary amount of time to do so.

## VI.

For the foregoing reasons, we affirmed the district court's order denying Weaver's motion to suppress, and also affirm the district court's evidentiary rulings.

*AFFIRMED*

---

[7]Also undercutting Weaver's claim is the court's express statement of neutrality:

> And you need the certificate of insurability if it is at issue. As I say, it usually is stipulated. I've never seen this happen [i.e., not being stipulated to]. *I would do, on this kind of technical issue, I would do the same for the defendant*. This is not a matter of the absence of preparation or anything like that as far as trying to drum up testimony.