**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-4329**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

JUAN HERNANDEZ GAMEZ,

        Defendant - Appellant.

Appeal from the United States District Court for the Middle
District of North Carolina, at Durham.  N. Carlton Tilley, Jr.,
District Judge.  (1:07-cr-00188-NCT-1)

Argued:  January 27, 2009        Decided:  February 19, 2009

Before MOTZ, KING, and DUNCAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Eric David Placke, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Greensboro, North Carolina, for Appellant.  Frank
Joseph Chut, Jr., OFFICE OF THE UNITED STATES ATTORNEY,
Greensboro, North Carolina, for Appellee.  **ON BRIEF:** Louis C.
Allen, III, Federal Public Defender, Greensboro, North Carolina,
for Appellant.  Anna Mills Wagoner, United States Attorney,
Greensboro, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Juan Hernandez Gamez appeals the district court's denial of his motion to suppress evidence seized during the search of his automobile following a routine traffic stop. Gamez contends that he was not free to leave the scene after the valid traffic stop ended. Alternatively, he argues that he did not knowingly and voluntarily consent to the search of his vehicle. Finding no merit in either contention, we affirm.

I.

At about one o'clock in the morning, Officer Barry Crump stopped a car driven by Gamez in a high-crime area because the officer noticed that Gamez was not wearing a seat belt and because the rear tag light was out. There was a passenger in the vehicle with Gamez. Crump ascertained from his patrol vehicle computer that the North Carolina Division of Motor Vehicles had permanently suspended Gamez's driver's license, which required Crump to seize the license. The computer also alerted Crump of previous narcotic activity by Gamez.

While preparing a citation for driving with a suspended license, Crump summoned a K-9 unit to the scene, resulting in the arrival of both the K-9 unit and another patrol car. Crump and the two other officers approached the vehicle to issue the citation to Gamez. One officer stayed on the passenger side of

2

the car near the rear passenger door.  Leaving his dog in his car at this point, the K-9 officer remained about three to five feet behind Gamez's vehicle.  Crump stood within arm's length of the driver's door while conversing with Gamez.

Although Gamez now asserts that his primary language is Spanish, Crump and Gamez conversed entirely in English, with no apparent need for a translator.  Crump handed Gamez the citation and informed him that the officer had permanently seized Gamez's suspended license.  Crump then informed Gamez that he was free to go, but could not drive away without a license, to which Gamez replied, "Okay."

After about a one-second pause, Crump asked Gamez if he had any contraband in the vehicle.  Gamez replied in the negative and then assented to Crump's request to search the vehicle. Crump asked Gamez and his passenger to stand by the rear of the vehicle during the search.  Assisted by the K-9 officer and his dog, Crump found a loaded nine-millimeter handgun in the rear map pocket of the front passenger's seat, along with several thousand dollars in cash in the center console of the car. Gamez admitted that he owned the gun.

Crump arrested Gamez for carrying a concealed weapon and released the passenger, who also did not have a driver's license.  At the station, Gamez waived his Miranda rights and gave an oral statement in English, despite the presence of a

Spanish-speaking officer.  Although Gamez did give a written statement in Spanish, he admitted that he could speak English and only orally lapsed into Spanish when searching for a particular word.

Gamez moved to suppress the gun (and, pursuant to the fruit of the poisonous tree doctrine, his statements admitting ownership of it) under two theories: (1) that Crump exceeded the scope of a lawful traffic stop in continuing to question Gamez after issuing the citation; and (2) that even if the traffic stop had become a voluntary encounter, Gamez did not consent knowingly and voluntarily to the search.  The district court rejected both arguments and denied the motion to suppress. Gamez then conditionally pleaded guilty to violating 18 U.S.C. § 922(g)(5) (2006), possession of a firearm in commerce by an illegal alien, reserving the right to appeal the district court's denial of his suppression motion.

II.

Gamez first contends that the district court erred in finding that the traffic stop at issue in this case had become a voluntary encounter.  Although Gamez does not contest the initial legality of the traffic stop, he asserts that under the totality of the circumstances a reasonable person would not have felt free to go once Crump issued the citation.  For this

4

reason, Gamez asserts that the traffic stop never became a voluntary encounter and Crump's continued questioning and the resultant search exceeded the scope of a lawful traffic stop.

Because the test for whether a Terry stop, see Terry v. Ohio, 392 U.S. 1, 30-31 (1968), has transitioned to a voluntary encounter is an objective one, we review the district court's factual findings regarding this issue for clear error, while reviewing its legal conclusions de novo. United States v. Meikle, 407 F.3d 670, 672 (4th Cir. 2005). Furthermore, we examine the totality of the circumstances when conducting this review. Id.

Gamez cites four primary reasons why, in his view, under the totality of the circumstances, this traffic stop had not become a voluntary encounter. First, Crump stopped Gamez in a high-crime neighborhood late at night. Second, Crump allegedly blocked the exit of the vehicle while continuing to question Gamez. Third, Gamez's Hispanic heritage and status as an illegal immigrant made it difficult for him to communicate and left him feeling particularly threatened by a law enforcement officer. Finally, Crump retained Gamez's license; because Gamez's passenger also did not have a valid license, Gamez therefore had no way to leave this high-crime neighborhood other than on foot.

5

Although these circumstances may have placed Gamez in an awkward position, we cannot find that such awkward circumstances rise to the level of a Fourth Amendment violation. See United States v. Weaver, 282 F.3d 302, 311-12 (4th Cir. 2002). Taken on their own, the first three factors cited by Gamez do little to distinguish his case from our precedents. See, e.g., Meikle, 407 F.3d at 672-74; United States v. Sullivan, 138 F.3d 126, 132-34 (4th Cir. 1998); United States v. Lattimore, 87 F.3d 647, 652-53 (4th Cir. 1996) (en banc); United States v. Rusher, 966 F.2d 868, 876-77 (4th Cir. 1992).

Moreover, although the addition of the final factor, the retention of Gamez's driver's license, briefly gives us pause, we are not persuaded that it prevented this lawful Terry stop from becoming a voluntary encounter. In cases in which courts have found retention of travel documents particularly compelling, the documents in question were not only necessary for the defendant to continue on his way, but also were the defendant's rightful property. Their retention therefore presented the defendant with the untenable choice of ending the encounter with no legal means of actually leaving the scene, or consenting to further interaction with law enforcement in order to retrieve the documents. See, e.g., Florida v. Royer, 460 U.S. 491, 501-04 (1983) (retention of the defendant's airline ticket and driver's license); United States v. Brugal, 209 F.3d

6

353, 358 (4th Cir. 2000) (en banc) (retention of defendant's rental car agreement); United States v. Walker, 933 F.2d 812, 816–17 (10th Cir. 1991) (retention of defendant's lawful driver's license and registration).

In sharp contrast to these cases, the DMV order indisputably required Officer Crump to retain Gamez's license. Thus, Gamez could not legally have driven away even had he wanted to do so.[*] Moreover, Officer Crump explicitly informed Gamez that he was free to go. Although law enforcement officers are not required to inform motorists that they are free to go, Ohio v. Robinette, 519 U.S. 33, 39–40 (1996), when they do, this strongly weighs in favor of finding that the encounter had become voluntary. See, e.g., United States v. Farrior, 535 F.3d 210, 217–18 (4th Cir. 2008); Rusher, 966 F.2d at 877; cf. Arizona v. Johnson, No. 07-1122, slip op. at 8 (U.S. Jan. 26, 2009) ("Normally, the [traffic] stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.").

---

[*] Indeed, rejecting a bright line rule regarding retained driver's licenses, this court has found retention of a license under even more coercive circumstances not to convert a citizen-police encounter into an unlawful seizure (albeit outside the traffic stop context). Weaver, 282 F.3d at 312–13.

Thus, the totality of the circumstances do not favor finding that a reasonable person in Gamez's position would not have felt free to go.

## III.

Alternatively, Gamez contends that even had the encounter with Officer Crump become voluntary, he did not knowingly and voluntarily consent to the search of his vehicle. Because voluntariness of consent is a factual question, we review the district court's findings on this issue for clear error. Lattimore, 87 F.3d at 650-51. And like the first issue in this case, we must examine the totality of the circumstances surrounding the consent when conducting this review. Id. at 650.

Gamez relies on the same factors regarding this issue as he does above, adding only that there was no evidence that Gamez knew he could decline to consent to the search. Although we have found this to be relevant to voluntariness of consent, see id. at 650, when viewed in combination with the totality of the circumstances here, it does not undermine the voluntariness of Gamez's consent to this search. As the district court noted, no matter what Gamez said regarding the request to search his vehicle, he knew he would not get his license back and would have to walk either home or to a place from which he could call

8

a cab or a ride.  Thus, the district court's conclusion regarding Gamez's consent was not clearly erroneous.

IV.

For the reasons stated above, we affirm the district court's denial of Gamez's motion to suppress.

AFFIRMED