PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　*Plaintiff-Appellant,*

　　　　v.

MARIO TERRELL DAY,

　　　　　*Defendant-Appellee.*

No. 08-5231

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(3:08-cr-00403-RLW-1)

Argued: October 28, 2009

Decided: January 8, 2010

Before KING, SHEDD, and DAVIS, Circuit Judges.

Reversed and remanded by published opinion. Judge King
wrote the opinion, in which Judge Shedd joined. Judge Davis
wrote a separate opinion dissenting in part and concurring in
the judgment in part.

## COUNSEL

**ARGUED**: Richard Daniel Cooke, OFFICE OF THE
UNITED STATES ATTORNEY, Richmond, Virginia, for
Appellant. Mary Elizabeth Maguire, OFFICE OF THE FED-

ERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellee. **ON BRIEF**: Dana J. Boente, Acting United States Attorney, Alexandria, Virginia, Michael C. Moore, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellant. Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia, for Appellee.

## OPINION

KING, Circuit Judge:

The Government pursues this interlocutory appeal from the district court's decision of December 1, 2008, suppressing evidence obtained from defendant Mario Day by private security guards. *See United States v. Day*, 590 F. Supp. 2d 796 (E.D. Va. 2008). The court's decision was premised on its determination that the security guards acted as Government agents and contravened Day's constitutional rights. More specifically, the court concluded that the security guards violated Day's Fourth Amendment rights, by conducting a search and seizure beyond the scope authorized in *Terry v. Ohio*, 392 U.S. 1 (1968), and his Fifth Amendment rights, by conducting a custodial interrogation without first giving Day the warnings required under *Miranda v. Arizona*, 384 U.S. 436 (1966). Because we conclude that the security guards were not acting as Government agents, we reverse and remand.

I.

The relevant facts, as outlined by the district court, are as follows:

> On July 5, 2008, Officers Costa and Slader of the American Security Group were on duty at the Regency Lake apartment complex [in Chesterfield

County, Virginia]. They are both "armed security officers" with the power to arrest pursuant to Virginia Code Section 9.1-138 *et seq.* While patrolling, the officers noticed a gathering at 6464 Planet Road. Shortly after midnight, they observed individuals later identified as Evan Moore and Mario Day, the defendant, in the middle of the road arguing with unseen individuals inside the apartment. The officers observed Day retrieve a gun from a nearby Caprice. Holding the gun at the "low and ready," Day began advancing on the apartment while continuing to shout at the individuals inside. Exiting their patrol car, the officers drew their weapons and yelled at Day to freeze as they ran towards him. Day immediately placed the gun on the floorboard of the Caprice and raised his hands. The officers placed Day in restraints and conducted a *Terry* search, wherein they found no suspicious bulges or hard objects. Nevertheless, and without giving any *Miranda* warnings, Officer Costa asked Day if he had "anything illegal" on him. Day admitted he ha[d] a little marijuana; Officer Costa reached into Day's pants pocket and retrieved the marijuana. The officers also questioned Day about the firearm, which he said he was carrying for his safety.

The officers contacted their superior, Lieutenant Pentato, and the Chesterfield police department. Chesterfield Police Officer Neville arrived and took over custody of Day and Moore.

*Day*, 590 F. Supp. 2d at 799.

On September 3, 2008, a grand jury in the Eastern District of Virginia indicted Day on a single count of being a drug user in possession of a firearm, in contravention of 18 U.S.C. § 922(g)(3), and on an additional count of possession of marijuana, in violation of 21 U.S.C. § 844(a). On October 17,

2008, Day filed a motion to suppress "the firearm, marijuana and all statements made by [him] on the day of his arrest." J.A. 75.[1] Thereafter, on November 12, 2008, the district court conducted a hearing on the suppression motion.

By its decision of December 1, 2008, the district court granted Day's suppression motion in part and denied it in part. More specifically, the court granted the suppression motion "as to the marijuana and to all statements about the firearm or marijuana," and denied the motion "as to the firearm" itself. *Day*, 590 F. Supp. 2d at 804.[2] In so ruling, the court first determined that Officers Costa and Slader, though private security guards, "were acting as governmental agents in their interactions with Day." *Id.* at 802. Accordingly, the court proceeded to consider whether Costa and Slader had contravened Day's constitutional rights. The court concluded that, "[t]o ensure their safety and that of bystanders, the officers were justified in conducting the pat-down of Day's clothing" and in "seiz[ing] . . . the plainly visible gun." *Id.* at 803. The court further concluded, however, that once the pat-down revealed "nothing indicative of either a weapon or contraband," the search was "no longer valid under *Terry*" — thus requiring suppression of the marijuana. *Id.* (internal quotation marks omitted). Finally, the court concluded that Day was in custody when he was questioned by Costa and Slader, and

---

[1]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[2]Notably, the district court ruled on the admissibility of Day's statements not only to the private security guards (Officers Costa and Slader), but also to the Chesterfield police officer called to the scene (Officer Neville). The Government "conceded that Officer Neville engaged in custodial interrogation without advising Day of his *Miranda* rights," and the court concluded that "any statements Day made to Neville about either the marijuana or the gun must be suppressed." *Day*, 590 F. Supp. 2d at 804. In this interlocutory appeal, the Government does not challenge the court's suppression of Day's statements to Neville. Thus, our review is limited to the status of Costa and Slader as Government agents and the suppression of the marijuana and the statements made to them.

that, having already "secured the firearm and conducted a fruitless *Terry* search," "the officers could not get a second bite at the apple by engaging in custodial interrogation without issuing a *Miranda* warning." *Id.* at 804. The court therefore suppressed Day's statements to Costa and Slader about the marijuana and the firearm. *See id.*

On December 10, 2008, the day before Day's trial had been scheduled to begin, the Government timely noted this appeal. In accordance with the jurisdictional predicate of 18 U.S.C. § 3731, the United States Attorney has certified that the appeal "is not taken for the purpose of delay" and that the excluded evidence constitutes "a substantial proof of a fact material in the proceeding." J.A. 95. We thus possess jurisdiction pursuant to the provisions of § 3731.

## II.

In assessing a trial court's decision on a motion to suppress, we review the court's factual findings for clear error and its legal determinations de novo. *See United States v. Kellam*, 568 F.3d 125, 132 (4th Cir. 2009). The Government's primary contention in this appeal is that the district court erred in concluding that Officers Costa and Slader were acting as Government agents at the time of their encounter with Day. As such, the Government asserts that the court erroneously suppressed the marijuana, as well as the marijuana- and firearm-related statements. As explained below, we agree with the Government and thus reverse and remand.[3]

---

[3]In these circumstances, we need not reach the Government's alternative contention that the marijuana and marijuana-related statements should not have been suppressed because the marijuana-related statements were made during a *Terry* stop, and not during a custodial interrogation requiring *Miranda* warnings. Notably, this contention would not justify a complete reversal of the district court's suppression rulings, as the Government acknowledges that the firearm-related statements are inadmissible under *Miranda* if Costa and Slader were acting as Government agents.

## A.

It is axiomatic that "[t]he Fourth Amendment protects against unreasonable searches and seizures by Government officials and those private individuals acting as instruments or agents of the Government." *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)) (internal quotation marks and alterations omitted). The Fourth Amendment, however, "does not provide protection against searches by private individuals acting in a private capacity." *Id.* (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Similarly, "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). Thus, regardless of whether the Fourth or Fifth Amendment is at issue, we apply the same test to determine whether a private individual acted as a Government agent. *Cf. United States v. Alexander*, 447 F.3d 1290, 1294-95 (10th Cir. 2006).

First of all, under the applicable test, "[t]he defendant bears the burden of proving that an agency relationship exists" between the Government and the private individual. *Jarrett*, 338 F.3d at 344 (citing *United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir. 2003)).[4] As we have observed, "whether the requisite agency relationship exists 'necessarily turns on the degree of the Government's participation in the private party's activities, . . . a question that can only be resolved in light of all the circumstances.'" *Jarrett*, 338 F.3d at 344 (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614

---

[4]In *Jarrett* and *Ellyson*, we outlined the contours of the applicable test in the context of a Fourth Amendment, rather than a Fifth Amendment, claim. *See Jarrett*, 338 F.3d at 346-48 (assessing whether anonymous computer hacker was acting as Government agent when he procured child pornography files from defendant's computer); *Ellyson*, 326 F.3d at 528-29 (deciding whether defendant's roommate acted as Government agent when she located child pornography in shared residence and turned it over to police).

(1989)) (alteration in original). This "is a fact-intensive inquiry that is guided by common law agency principles." *Ellyson*, 326 F.3d at 527. We have recognized "two primary factors" to be considered: (1) "whether the Government knew of and acquiesced in the private" individual's challenged conduct; and (2) "whether the private individual intended to assist law enforcement or had some other independent motivation." *Jarrett*, 338 F.3d at 344; *see also Ellyson*, 326 F.3d at 527 (compressing two factors into "[o]ne highly pertinent consideration").

## B.

Here, in concluding that the private security guards, Officers Costa and Slader, acted as Government agents during their encounter with Day, the district court focused on the Commonwealth of Virginia's regulation of private security guards. The court noted that Costa and Slader each was an "armed security officer," as defined in the Code of Virginia. *See Day*, 590 F. Supp. 2d at 799 (citing Va. Code. Ann. § 9.1-138). And the court observed that "[t]hese officers were vetted, trained, and continue to be subject to disciplinary action under the aegis of the state's Criminal Justice Services Board." *Id.* at 801; *see also id.* at 800 (discussing Va. Code Ann. § 9.1-139(C), (F) (requiring an armed security officer to obtain "a valid registration" by satisfying "compulsory minimum training standards established by the Board" and submitting to a "state and national fingerprint search"); Va. Code Ann. § 9.1-141(C)(6) (empowering the Board, inter alia, to "[r]eceive complaints concerning the conduct of [an armed security officer], to conduct investigations, and to take appropriate disciplinary action if warranted")). Furthermore, of utmost importance to the court was the fact that, "[w]ithout limitation, the Virginia Code endows armed security officers with the power to effect arrests for any offenses occurring in an on-duty officer's presence." *Id.* at 801 (citing Va. Code Ann. § 9.1-146 (authorizing an armed security officer "to effect an arrest for an offense occurring . . . in his presence"

"while at a location which the [private security services] business is contracted to protect")).

Relevant to the first factor of the applicable agency test — whether the Government "knew of and acquiesced in" the challenged conduct of Officers Costa and Slader, *see Jarrett*, 338 F.3d at 344 — the district court determined that, in view of Virginia's regulatory scheme for armed security officers, "the state is not a mere passive participant" in their conduct. *Day*, 590 F. Supp. 2d at 801-02. "[R]ather," the court explained, Virginia "affirmatively encouraged and enabled these officers to engage in the complained-of conduct, for without their state-granted authority, these officers could not have acted as *de facto* police. In short, the state was the genesis of their power and activities rather than a mere passive recipient of the largess of their actions." *Id.* at 802.[5]

With respect to the second factor of the applicable agency test — whether Officers Costa and Slader "intended to assist law enforcement or had some other independent motivation," *see Jarrett*, 338 F.3d at 344 — the district court found that "[c]learly the officers acted with the intent of deterring crime and assisting law enforcement." *Day*, 590 F. Supp. 2d at 802. In light of all the circumstances, the court concluded that Costa and Slader "were acting as governmental agents in their interactions with Day." *Id.*

---

[5]As further support for the proposition that Officers Costa and Slader "were operating as *de facto* police on the night in question," the district court observed that "[t]he officers were 'patrolling' the area in their unmarked sedan (a car of sufficient similarity to the stereotypical image of an unmarked police car that a Chesterfield officer 'assumed' it must be the security officers' vehicle)," and that "[b]oth officers were wearing black uniforms with gold emblems on the sleeves, displaying a gold badge virtually identical to a police shield, and bearing handguns," rendering them "the quintessential image of law enforcement." *Day*, 590 F. Supp. 2d at 802.

C.

Although the district court's analysis has some appeal, we ultimately cannot agree that Day met his burden of proving an agency relationship between the Government and Officers Costa and Slader. *Cf. United States v. Poe*, 556 F.3d 1113, 1117 (10th Cir. 2009) (ruling that private bounty hunters did not qualify as state actors); *United States v. Shahid*, 117 F.3d 322, 323 (7th Cir. 1997) (concluding that private security officers at shopping mall were not acting as agents of Government). In explaining why this is so, we address each factor of the applicable agency test in turn.

1.

As discussed above, the first factor of the applicable test concerns "whether the Government knew of and acquiesced in the private" individual's challenged conduct. *Jarrett*, 338 F.3d at 344. Significantly, "[i]n seeking to give content to this factor, we have required evidence of more than mere knowledge and passive acquiescence by the Government before finding an agency relationship." *Id.* at 345 (citing *Ellyson*, 326 F.3d at 527-28). Thus, for example, in the case of an alleged Fourth Amendment violation, "simple acquiescence by the Government does not suffice to transform a private search into a Government search. Rather, there must be some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional. Passive acceptance by the Government is not enough." *Id.* at 345-46.

In the district court's view, because Virginia regulates armed security officers — and particularly because it confers on such officers the power to make certain arrests — the Commonwealth "affirmatively encouraged" the challenged conduct of Officers Costa and Slader. *See Day*, 590 F. Supp. 2d at 802. Virginia's regulatory scheme, however, merely permitted Costa and Slader to arrest Day; it did not require or

even encourage an arrest or any other complained-of action. Indeed, nothing in the regulatory scheme suggests that Costa and Slader "would expect some benefit (*e.g.*, receiving a reward from the government) from taking the action, or expect some detriment (*e.g.*, getting in trouble with government authorities) from not acting." *See Shahid*, 117 F.3d at 327 (describing situations where Government knew of and acquiesced in private party's conduct). For example, although armed security officers are generally subject to disciplinary action by the Commonwealth, *see* Va. Code Ann. § 9.1-141(C)(6), nothing in this record indicates that Virginia could have disciplined Costa and Slader for failing to act as they did toward Day.

In these circumstances, we cannot agree with the district court that Virginia's regulatory scheme served to "affirmatively encourage" Costa and Slader's challenged conduct. Rather, Costa and Slader were simply empowered by the Commonwealth to make an arrest. This "'[m]ere governmental authorization'" for an arrest by Costa and Slader, "'in the absence of more active participation or encouragement,'" is insufficient to implicate the Fourth and Fifth Amendments. *See Jarrett*, 338 F.3d at 345 (quoting *United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981)); *cf. Poe*, 556 F.3d at 1124 (explaining that "Oklahoma's extensive statutory regulation of the bail bonds industry, coupled with conferring the powers of arrest," was insufficient to establish governmental "knowledge of or acquiescence in the [bounty hunters'] challenged search" (internal quotation marks omitted)); *Shahid*, 117 F.3d at 327 (observing that "[t]he government cannot be said to have induced" the challenged search by mall security officers, who expected no "benefit or detriment from the government as a result of their actions").[6]

---

[6]In certain circumstances, the conduct of a private party can be attributed to the Government as the result of a regulatory scheme. For example, in *Skinner*, the Supreme Court concluded that blood and urine tests required by private railroads — in voluntary compliance with federal regu-

The proposition that Virginia did not participate in or encourage the challenged conduct of Officers Costa and Slader is reinforced by testimony given during the November 12, 2008 suppression hearing in the district court — testimony uncontradicted by Day and not addressed by the court. Costa testified that, as of the time of his encounter with Day on July 5, 2008, no law enforcement agency had ever given him any directives concerning his work as a private security guard at the Regency Lake apartment complex. More specifically, Costa had received no instructions from the Chesterfield police department regarding Day and expected no reward from the police department for his actions that night. Similarly, Slader testified that no state or federal law enforcement agency directed his day-to-day activities as a security guard, that he received no compensation from any state entity, and that he neither expected nor received any reward from the Chesterfield police department in connection with Day. Additionally, Officer Neville of the Chesterfield police department — who was called to the scene and assumed custody of Day only after Costa and Slader's challenged conduct occurred — testified that he had never directed the activities of any private security guards at the Regency Lake apartment complex. According to Neville, although he had responded to a call at the apartment complex prior to July 5, 2008, he had never previously interacted with the security guards there.

---

lations governing these tests — implicated the Fourth Amendment. *See* 489 U.S. at 614-15. The Court explained that "specific features of the regulations combine to convince us that the Government did more than adopt a passive position toward the underlying private conduct." *Id.* at 615. Such features "removed all legal barriers to the testing authorized by" the regulations, "made plain [the Government's] strong preference for testing," and expressed the Government's "desire to share the fruits of such intrusions." *Id.* This case, by contrast, presents "the more usual situation in which the government merely knows of or acquiesces in a private person's [conduct], whose fruits (*e.g.*, drugs or a confession) are then appropriated by the government for its own purposes." *See Presley v. City of Charlottesville*, 464 F.3d 480, 488 n.7 (4th Cir. 2006).

In light of this undisputed evidence, there simply is no basis for concluding that the Government participated in or affirmatively encouraged Costa and Slader's challenged conduct. Accordingly, Day cannot satisfy his burden on the first factor of the applicable agency test.

2.

The second factor of the agency test concerns "whether the private individual intended to assist law enforcement or had some other independent motivation." *Jarrett*, 338 F.3d at 344. With respect to this factor, the district court found that "[c]learly the officers acted with the intent of deterring crime and assisting law enforcement." *Day*, 590 F. Supp. 2d at 802. Of course, the objective of "deterring crime" is entirely consistent with Officer Costa and Slader's responsibility to protect the tenants and property of the Regency Lake apartment complex, irrespective of any simultaneous goal of assisting law enforcement. *See, e.g.*, J.A. 15 (testimony of Costa that "we are there as a deterrent"). "In any event, even if the sole or paramount intent of the security officers had been to assist law enforcement, . . . such an intent would not transform a private action into a public action" absent a sufficient showing of Government knowledge and acquiescence under the first factor of the agency test. *See Shahid*, 117 F.3d at 326 (internal quotation marks omitted). Having concluded that Day failed to satisfy the test's first factor, he cannot yet establish that Costa and Slader were acting as Government agents by satisfying the second factor. *See Jarrett*, 338 F.3d at 345 (recognizing that, because Government conceded second factor of agency test, private individual's status as Government agent turned on first factor thereof).

D.

Finally, we address a theory of agency relied on by the district court and pursued in this appeal by Day: that, under the "public function" test typically utilized for assessing a private

party's susceptibility to a civil rights suit under 42 U.S.C. § 1983, Virginia's conferral of arrest powers on Officers Costa and Slader was enough to render them *de facto* police. *See Day*, 590 F. Supp. 2d at 800-01 ("'Where private security guards are endowed by law with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test.'" (quoting *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 637 (6th Cir. 2005)). Our Court has applied such a test, in *Rodriguez v. Smithfield Packing Co.*, to determine whether a plant security official was a state actor for purposes of § 1983 liability. *See* 338 F.3d 348, 354-55 (4th Cir. 2003). As we explained in *Rodriguez*, "[t]he Fourth Circuit has held that 'one of the paradigmatic means by which a private party becomes subject to section 1983 is through the government's conferral upon that party of what is, at core, sovereign power' — a power, in other words, that is 'traditionally the exclusive prerogative of the State.'" *Id.* at 354 (quoting *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000)); *see also Romanski*, 428 F.3d at 636 ("Under the public function test, a private entity is said to be performing a public function if it is exercising powers traditionally reserved to the state . . . .").[7]

The *Rodriguez* plaintiffs brought § 1983 claims against a plant security official, Daniel Priest, for constitutional violations allegedly committed during the plaintiffs' August 22, 1997 arrests at the plant, in Bladen County, North Carolina, by Priest and the Bladen County Sheriff's Department. *See* 338 F.3d at 352. In analyzing whether Priest was a state actor subject to § 1983 liability, we deemed the following facts to be relevant to our inquiry:

---

[7]The parties dispute whether, in the circumstances of Day's suppression motion, it is appropriate to apply a "free-standing" public function test or to utilize such a test as part of analyzing the first factor of the agency test. Because we conclude that Officers Costa and Slader were not state actors under the public function test, we need not resolve this issue.

Priest was an auxiliary deputy sheriff[, i.e., a sworn deputy sheriff who is not on the payroll and works at the discretion of the County Sheriff,] invested with the full panoply of powers afforded to full-time deputies, including the power to arrest. The County Sheriff had given Priest primary responsibility in his role as auxiliary deputy sheriff for a broad range of law enforcement work at the plant, from conducting criminal investigations and making arrests to serving civil and criminal papers. On August 22, Priest was working in concert with the Sheriff's Department to provide security in a potentially volatile situation. He had a deputy sheriff badge clipped on his belt, a sheriff's department radio, handcuffs, pepper spray, and a gun. And he testified that he told [one of the plaintiffs] "Sheriff's Department, you are under arrest," handcuffed him, and enlisted another deputy to help him take [that plaintiff] out of the building and to the waiting police car.

*Id.* at 354-55. Priest's actions were, as we observed, "the natural result of [his] official role within Bladen County, in which he was expected to perform law enforcement functions at the . . . plant on behalf of the Sheriff's Department." *Id.* at 355. These circumstances compelled the conclusion "that Priest was acting under color of state law when making arrests at the [plant] on August 22." *Id.* In so ruling, we observed that "[i]t is beyond dispute that the police function is 'one of the basic functions of government,'" and that "an arrest is 'the function most commonly associated with the police.'" *Id.* (quoting *Foley v. Connelie*, 435 U.S. 291, 297, 298 (1978)). As such, we explained, "[i]t would be hard to imagine . . . a more prototypically representative government function than Priest's use of his official capacity to effectuate the arrest of [the plaintiffs]." *Id.*

In the Sixth Circuit's *Romanski* decision, the plaintiff sought to hold a casino security officer liable under § 1983 for

unlawful arrest. *See* 428 F.3d at 634. The court concluded that, "[w]here private security guards are endowed by law with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test." *Id.* at 637. By contrast, the court explained, private security guards afforded "some police-like powers but not plenary police authority" do not qualify as state actors. *Id.* The court defined plenary police powers to include a private security guard's state-conferred authority, "while on her employer's property during her working hours," to "make warrantless arrests to the same extent as a public police officer." *Id.* at 638 n.3. Thus, because the casino security officer had the same authority to make a warrantless arrest of the plaintiff as that conferred on public peace officers, the court concluded that she was a state actor. *See id.* at 638.

Unfortunately for Day, neither our *Rodriguez* decision nor the Sixth Circuit's *Romanski* decision is helpful to him. First of all, the facts pertaining to the state actor issue are not nearly as compelling as in *Rodriguez*, where the private party was operating in his official role as an "auxiliary deputy sheriff," served under the direction of and in concert with the Sheriff's Department, and was "invested with the full panoply of powers afforded to full-time deputies, including," but not limited to, "the power to arrest." *See* 338 F.3d at 354-55.[8] Moreover, even assuming we would agree with the *Romanski*

---

[8]Notably, we also deemed it relevant in *Rodriguez* that, at the time of the challenged arrests, the private party was outfitted with an official deputy sheriff badge and verbally identified himself as being with the "Sheriff's Department." *See* 338 F.3d at 355. Meanwhile, it was significant to the district court that, at the time of their encounter with Day, Officers Costa and Slader were driving a vehicle *similar* to an unmarked police car and wearing *police-type* uniforms and badges. *See Day*, 590 F. Supp. 2d at 802. However, absent evidence indicating, for instance, that Costa and Slader's car, uniform, and badges were official police items used at the Government's behest — similar to the evidence in *Rodriguez* — we are not persuaded that such items support the proposition that Costa and Slader were state actors.

court that plenary arrest authority alone could transform a private individual into a state actor, Officers Costa and Slader did not possess the same power to make warrantless arrests afforded to Virginia police officers. As discussed above, Virginia authorizes an armed security officer "to effect an arrest for an offense occurring . . . *in his presence*." Va. Code Ann. § 9.1-146 (emphasis added). The Commonwealth empowers police officers, by contrast, to "arrest, without a warrant, any person who commits any crime in the presence of the officer *and* any person whom he has reasonable grounds or probable cause to suspect of having committed a felony not in his presence." *Id.* § 19.2-81 (emphasis added).[9] Indeed, not only is the arrest power of armed security officers more circumscribed than that of police officers, but it is also essentially the same as that of any private citizen. *See Hudson v. Commonwealth*, 585 S.E.2d 583, 588 (Va. 2003) (recognizing that citizen may make arrest for misdemeanor breach of peace or felony committed in his presence). Accordingly, unlike in *Romanski*, Costa and Slader were not endowed with plenary arrest authority, but rather were "permitted to exercise only what were in effect citizens' arrests." *See Romanski*, 428 F.3d at

---

[9]Section 19.2-81 of the Code of Virginia identifies nine categories of officers authorized to make warrantless arrests for suspected felonies committed outside their presence — a comprehensive list that noticeably excludes armed security officers. The nine categories of authorized officers include the following: "Members of the State Police force of the Commonwealth"; "Sheriffs of the various counties and cities, and their deputies"; "Members of any county police force or any duly constituted police force of any city or town of the Commonwealth"; "The Commissioner, members and employees of the Marine Resources Commission granted the power of arrest pursuant to § 28.2-900"; "Regular conservation police officers appointed pursuant to § 29.1-200"; "United States Coast Guard and United States Coast Guard Reserve commissioned, warrant, and petty officers authorized under § 29.1-205 to make arrests"; "The special policemen of the counties as provided by § 15.2-1737, provided such officers are in uniform, or displaying a badge of office"; "Conservation officers appointed pursuant to § 10.1-115"; and "Full-time sworn members of the enforcement division of the Department of Motor Vehicles appointed pursuant to § 46.2-217." Va. Code Ann. § 19.2-81.

639 (distinguishing *Wade v. Byles*, 83 F.3d 902, 906 (7th Cir. 1996) (concluding private security guard in public housing authority building was not state actor)). We are therefore constrained to reject the proposition that, under the public function test, Costa and Slader were acting as *de facto* police and, thus, were state actors.[10]

### III.

Pursuant to the foregoing, we conclude that Day has not met his burden of proving the existence of an agency relationship between the Government and the private security guards, Officers Costa and Slader, whose conduct is under challenge. Accordingly, we reverse the district court's suppression of the marijuana seized by Costa and Slader, as well as the firearm- and marijuana-related statements made to them by Day. We remand for such other and further proceedings as may be appropriate.

*REVERSED AND REMANDED*

DAVIS, Circuit Judge, dissenting in part and concurring in the judgment in part:

Officers Costa and Slader, uniformed, armed security officers clothed with broad law enforcement authority by, and subject to pervasive regulation under, Virginia law, detained

---

[10]Our conclusion that Officers Costa and Slader were not state actors is bolstered by an additional consideration: it does not appear that Virginia would consider armed security officers to be state actors on these facts. *See Goldstein*, 218 F.3d at 347 ("Another factor relevant to the state actor determination is how the state itself views the entity."). The Court of Appeals of Virginia has concluded in similar circumstances, for example, that private department store security guards were not state actors required to give *Miranda* warnings. *See Mier v. Commonwealth*, 407 S.E.2d 342, 345-46 (Va. Ct. App. 1991); *see also Coston v. Commonwealth*, 512 S.E.2d 158, 160 (Va. Ct. App. 1999) (recognizing "[t]he general rule" that "a private security officer" is *not* "a public officer or public employee").

Appellee Mario Day at gunpoint, handcuffed him, searched his car and his person, and interrogated him, and thereby collected critical evidence for the government in its prosecution of Day. The majority expansively concludes, nevertheless, that the officers' actions were not "fairly attributable" to the Commonwealth. *See Brentwood Acad. v. Tenn. Secondary Schs. Athletic Ass'n*, 531 U.S. 288, 295; *id.* at 312 (Thomas, J., dissenting). Consequently, the majority concludes that the constraints imposed by the federal constitution on governmental investigations of criminal activity had no application in this case. I respectfully dissent from this holding.

Under the facts and circumstances shown on this record, when Officer Costa retrieved the marijuana from Day's pants pocket, J.A. 22, and when he questioned the handcuffed Day about Day's possession of the handgun while they awaited the arrival of a local law enforcement officer to take custody of Day, *id.*, Officer Costa was engaged in traditional law enforcement activity plainly intended, as a matter of law, to aid in the prosecution of Day for criminal offenses. Officer Costa's actions were made possible by and legitimized by Virginia law; no private citizen could have achieved what he did on behalf of the government under the circumstances presented here.

Accordingly, Officer Costa's interrogation of Day regarding the latter's possession of "anything illegal," his subsequent search of Day's pants pocket and seizure of the marijuana, and his later questioning regarding Day's possession of the handgun, are all subject to scrutiny under prevailing constitutional standards, every bit as much as they would be if Officer Costa was a sworn governmental law enforcement officer.

I am persuaded that, tested by those constitutional standards, Day's admission that he possessed marijuana was the product of neither an unreasonable seizure of his person nor of custodial interrogation, and that the subsequent seizure of

the marijuana was reasonable under the Fourth Amendment. By the time that Officer Costa questioned Day regarding the handgun, however, Day's detention had ripened into an arrest. Accordingly, the handgun inquiry constituted an unwarned custodial interrogation, contravening the mandate of *Miranda v. Arizona*, 384 U.S. 436 (1966). Thus, I would reverse the district court's suppression of the marijuana and Day's admission that he possessed it, but affirm the district court's suppression of Day's statements to Costa regarding the handgun.

I.

The Supreme Court has never considered whether or under what circumstances "state action" inheres in the exercise of traditional police functions by state-authorized and regulated armed security guards. *Cf. Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163 n.14 (1978); *Romanski v. Detroit Entertainment, L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005) ("The Supreme Court has explicitly declined to decide the question of whether and under what circumstances private police officers may be said to perform a public function[.]").

The appropriate test for determining whether Officers Costa and Slader should be deemed state actors under the circumstances shown here, and therefore whether well-settled, constitutionally-rooted constraints on criminal investigations apply, is the public function test. Under this test, a private actor is deemed a state actor if the function performed is traditionally the exclusive prerogative of the State. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982); *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000) (citing *United Auto Workers v. Gaston Festivals, Inc.*, 43 F.3d 902, 906 (4th Cir. 1995)). That public function must be "traditionally exclusively reserved to the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974); *see Flagg Bros.*, 436 U.S. at 157.

As the Supreme Court has suggested, "police protection" is among those functions "which have been administered with a

great[ ] degree of exclusivity by States and municipalities[.]"
*Flagg Bros.*, 436 U.S. at 163. This court has echoed the
Supreme Court's recognition, noting that "the police function
is 'one of the basic functions of government,' [and] a 'most
fundamental obligation of government to its constituency.'"
*Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355
(4th Cir. 2003) (citing *Foley v. Connelie*, 435 U.S. 291, 297
(1978)). "It would be hard to imagine, in other words, a more
prototypically representative government function than [a pri-
vate security guard's] use of his official capacity to effectuate
[an] arrest." *Id.*

Our sister circuits apply a totality of the circumstances test
to determine whether private security guards should be treated
as state actors, paying special attention to the arrest powers
granted to private security guards and the extent to which the
guards are licensed by and regulated by the state. *E.g.*,
*Romanski*, 428 F.3d at 640; *Payton v. Rush-Presbyterian-St.
Luke's Medical Ctr.*, 184 F.3d 623, 630 (7th Cir. 1999).

In *Romanski*, the court held that private security officers
licensed by the state and having plenary arrest powers
(although those arrest powers only applied when the guards
were on duty and on their employer's property) were properly
deemed to act "under color of law" in a suit brought pursuant
to 42 U.S.C. § 1983. 428 F.3d at 640.[1] There, a private secur-
ity guard at a casino detained and interrogated a patron sus-
pected of stealing a token and the patron sued, alleging Fourth
Amendment violations. The district court held that the casino
employee was a state actor as a matter of law because she
possessed the same arresting authority enjoyed by the police.
*Id.* at 634-35.

---

[1]The "state action" inquiry mirrors the "under color of law" inquiry.
*Lugar*, 457 U.S. at 929; *Philips v. Pitt County Memorial Hosp.*, 572 F.3d
176, 180 (4th Cir. 2009) ("The statutory color-of-law prerequisite is syn-
onymous with the more familiar state-action requirement—and the analy-
sis for each is identical."); *Haavistola v. Cmty. Fire Co.*, 6 F.3d 211, 215
(4th Cir. 1993).

On appeal, the Sixth Circuit affirmed. *Id.* at 636. As cited by the district court here, the Sixth Circuit held that "where private security guards are endowed by law with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test[,]" *id.* at 637, and found that the casino guard had sufficient authority to qualify as a *de facto* police officer. The guard was also licensed and vetted by Michigan's department of state police. By statute, the guard had "the authority to arrest a person without a warrant as set forth for public peace officers . . . ." *Id.* (citing Mich. Comp. Laws §338.1080). Thus, the *Romanski* standard looks to whether a private security guard is licensed by the state and has "plenary police powers." *Cf. Lindsey v. Detroit Entertainment, LLC*, 383 F.3d 824, 830 (6th Cir. 2007) (holding that casino security guards who were not licensed by the state were not state actors).

The Seventh Circuit applied a similar test in reversing the grant of a motion to dismiss a § 1983 claim. *Payton*, 184 F.3d at 630. In *Payton*, the plaintiff brought a § 1983 claim based on his allegation that two hospital security guards detained, arrested, beat, struck, and kicked him without provocation. *Id.* at 625. The district court granted the guards' motion to dismiss on the basis that they did not act under color of law. *Id.* Plaintiff appealed and the Seventh Circuit reversed and remanded, holding that the guards could be deemed to act under color of law because they had plenary arrest power and were subject to the same rules as police officers. *Id.* at 628. The court noted that, under the applicable law, the private guards possessed "all of the powers of the regular police patrol; and therefore, that they must "conform to and be subject to all the rules and regulations governing police officers of the city." *Id.* at 630; *see also Henderson v. Fisher*, 631 F.2d 1115, 1119 (3rd Cir. 1980) (holding that university security guards with plenary arrest powers on campus are state actors for the purposes of §1983 claims); *cf. Wade v. Byles*, 83 F.3d 902, 906 (7th Cir. 1996) (holding that a private security guard is not a public actor when he lacks plenary arrest authority

and can only arrest people for criminal trespass pending the arrival of the police).

Under these persuasive precedents, when private security guards have "plenary police powers," *Romanski*, 428 F.3d at 637, and are licensed and heavily regulated by the state, they may be deemed public actors. Courts do not withhold state actor status based on whether a guard's arrest powers are limited to a specific geographical area. *See Payton*, 184 F.3d at 629-30 (arrest powers limited to hospital grounds); *Romanski*, 428 F.3d at 639-40 (arrest powers limited to casino grounds). Instead, the courts examine the scope of authority granted by the state to the officers and evaluate the extent of the regulation imposed by the state. Where guards have limited powers, *e.g.*, *Wade*, 83 F.3d at 905-06; *Johnson v. LaRabida Children's Hospital*, 372 F.3d 894, 897 (7th Cir. 2004), they are not deemed public actors. When guards enjoy "plenary police powers," however, they may, depending on the circumstances presented, assume the obligations of a state actor.

Properly viewed, then, in an appropriate case, private armed security guards in Virginia may be treated as public actors. This is in part because they have generous arrest authority. The guards may effectuate an arrest for *any* offense occurring in their presence while on the premises they guard, and even for some (primarily shoplifting-related) offenses not occurring in their presence. Va. Code Ann. §9.1-146.[2] Under the statute, there are even circumstances when the law requires that private security guards be deemed "arresting officers." *Id.* In fact, few differences exist in the scope of arrest authority between a private security guard and a state

---

[2]This court has been willing to afford an extraordinarily broad construction to the "in the presence" criterion. *U.S. v. McNeill*, 484 F.3d 301, 312 (4th Cir. 2007) (holding that Maryland's "in the presence" requirement for arrests "does not mandate that every element of the crime occur in the officer's presence, so long as the officer had sufficient evidence of all the elements and some were committed in his presence").

officer. Both may arrest for any crime committed in their presence, and for some misdemeanor crimes committed outside their presence. An additional power vested in the police is that they may arrest individuals for more numerous crimes committed outside of their presence. But of course, police officers themselves are limited to making arrests for crimes committed outside their presence to situations where they have "reasonable grounds or probable cause to suspect of having committed a felony not in his presence." Va. Code Ann. § 19.2-81. This difference in arrest power is sufficiently insignificant to declare that Virginia guards possess authority akin to plenary authority.[3] *See Romanski*, 428 F.3d at 638 n.3 (defining plenary police powers as state-conferred authority, "while on her employer's property during her working hours," to "make warrantless arrests to the same extent as a public police officer"). Manifestly, the power to arrest confers the power to search in a wide range of circumstances. *See Chimel v. California*, 395 U.S. 752, 759 (1969). Such authority was precisely that exercised by Officer Costa in this case.

Private security guards are also subject to a high level of government regulation. *See* Va. Code Ann. §9.1-138 *et seq*. As the court below explained, and the majority opinion notes, private security guards are "vetted, trained, and continue to be subject to disciplinary action under the aegis of the state's Criminal Justice Services Board." Maj. Op. at 7; *Day*, 590 F.

---

[3]The majority argues that the private security guard's role is the same as a private citizen with respect to arrest authority. *See* Maj. Op. at 15-16 (citing *Hudson v. Commonwealth*, 585 S.E.2d 583, 588 (Va. 2003)). This assertion is not true. *See* Va. Code Ann. §9.1-146. Private security guards have arrest authority that extends beyond crimes committed in their presence. *Id.* Additionally, in some cases, the statute actually transforms a private security guard into an "arresting officer," a privilege never accorded to citizens undertaking citizens' arrests. *Id.* It will be the rare citizen who effects an "arrest" employing handcuffs; so-called "bounty hunters" may well comprise a set of one. *United States v. Poe*, 556 F.3d 1113, 1123-24 (10th Cir. 2009), *cert. denied*, 130 S.Ct. 395, 2009 WL 1604770 (U.S. Oct. 13, 2009).

Supp. 2d at 801. Additionally, Virginia regulations require armed security officers to obtain a "valid registration" by satisfying "compulsory minimum training standards established by the Board" and submitting to a "state and national fingerprint search." *Day*, 590 F. Supp. 2d at 800 (discussing Va. Code Ann. § 9.1-139). Virginia also employs the Criminal Justice Services Board to "[r]eceive complaints concerning the conduct of [an armed security officer], to conduct investigations, and to take appropriate disciplinary action if warranted." Maj. Op. at 7 (discussing Va. Code Ann. § 9.1-141). In short, Virginia has a comprehensive regulatory scheme for its private security guards.

Because under Virginia law armed security guards are subject to extensive government regulation and enjoy extensive police powers, and because Officers Costa and Slader actually exercised those powers in this case, I would affirm the district court's order insofar as it deemed the private security guards in this case public actors in connection with their apprehension of Day, and I would require them to adhere to the same constitutionally-rooted constraints as ordinary police officers. This conclusion finds ample support among the courts of appeals.[4]

## II.

The majority, instead of applying a public function test tailored to armed private security guards, relies on a test intended to aid in the assessment of the activities of private individuals who become police informants and who mine information and report or deliver it to law enforcement. That test, the *Jarrett*/*Ellyson* test, inquires whether the government

---

[4]*Romanski*, 428 F.3d at 640; *Rodriguez*, 338 F.3d at 355; *Payton*, 184 F.3d at 627-630; *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423 (10th Cir. 1984); *Henderson v. Fisher*, 631 F.2d 1115, 1118-19 (3rd Cir. 1980); *Traver v. Meshriy*, 627 F.2d 934 (9th Cir. 1980); *El Fundi v. Deroche*, 625 F.2d 195, 196 (8th Cir. 1980).

knew of and acquiesced in the private individual's challenged conduct, and whether the private individual intended to assist law enforcement or had some other independent motivation. Maj. Op. at 7. But that test is inapplicable here for at least two reasons.[5] First, it was derived from a very different factual context and should not be remolded to control these facts. *United States v. Jarrett*, 338 F.3d 339, 344-46 (4th Cir. 2003) (determining that an anonymous computer hacker was not acting as a Government agent when he procured child pornography files from defendant's computer and delivered via email to law enforcement); *United States v. Ellyson*, 326 F.3d 527-28 (4th Cir. 2003) (determining that defendant's live-in girlfriend did not act as government agent when she located child pornography in their shared residence and turned it over to police because she acted of her own accord and not under the direction of the police).

Second, the majority misses the forest for the trees. The appropriate analysis requires an evaluation of the totality of the circumstances. *Jarrett* and *Ellyson* provide two illustrative examples of that test, but they should not be read to supplant the test itself. In fact, this court "has articulated a number of

---

[5]Arguably, the facts here satisfy the *Jarrett*/*Ellyson* test. The second element is fulfilled: the guards clearly intended to assist law enforcement when they detained, searched and interrogated Day. The majority opinion seemingly concedes this point, arguing that this case turns on the test's first element. Maj. Op. at 12. Further, Virginia's statutory scheme comes very close to satisfying the test's first element. The Commonwealth cloaks these guards with a comprehensive imprimatur of state authority. The guards must pass background checks and meet state training requirements, and when they do, the Commonwealth imbues them with expansive arrest and search powers. It even considers them to be, at times, arresting officers. Va. Code Ann. §9.1-146. Although the Commonwealth may not have advance knowledge of every individual arrest and search undertaken by a private security guard, the same is true of its sworn law enforcement officers. The Commonwealth cannot feign ignorance when armed private security guards do exactly what they are trained, regulated, licensed, and authorized to do: detain and arrest individuals, execute attendant searches, and conduct interrogations of suspects.

different factors or tests in different contexts," for the public function test and the facts "which would convert the private party into a state actor [vary] with the circumstances of the case." *Goldstein*, 218 F.3d at 342-43 (citing *Lugar*, 457 U.S. at 937).

I would limit application of the *Jarrett*/*Ellyson* test to cases involving private persons acting as police informants, a methodology supported by the analysis in the cases themselves. In both cases, this court explicitly eschewed a formalistic test, instead noting that the analysis is fact-intensive, *Ellyson*, 326 F.3d at 527, and "can only be resolved in light of all of the circumstances." *Jarrett*, 338 F.3d at 344 (quoting *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614-15 (1989)).

Thus, *Jarrett* and *Ellyson* provide a useful framework for analyzing government informants under the public function test. But those two cases do not transform the general inquiry into a strict two-factor analysis. The overarching issue remains whether the conduct of the private actors is fairly attributed to the state. *Brentwood Academy*, 531 U.S. at 295. In *Jarrett* and *Ellyson*, this court focused on the two aspects of the totality of the circumstances, factors that were particularly relevant as to government informants acting without governmental supervision.

But the appropriate test for this case must focus on the particularities of armed private security guards, their authority and the manner in which they exercise that authority, a fundamentally different scenario than that presented with regard to government informants, and one discussed only in persuasive precedent from our sister circuits. Private security guards have arrest authority and are subject to significant governmental regulation, two factors completely absent from the analysis for government informants.[6] Accordingly, instead of

(Text continued on page 28)

---

[6]The majority opinion also cites to Virginia court decisions to bolster its approach. Maj. Op. at 17 n.10. Because this case addresses a federal

constitutional issue, I do not find the Virginia courts' analyses particularly useful. *Cf. Virginia v. Moore*, 128 S.Ct. 1598, 1608 (2008) ("[I]t is not the province of the Fourth Amendment to enforce state law.") Further, the cases cited by the majority do not support its assertion that armed security officers may never be deemed state actors.

The majority cites *Goldstein* for the proposition that it should consider how the courts of Virginia view the state action issue. Maj. Op. at 17 n.10. In *Goldstein*, the court held that a volunteer fire company in Maryland was a state actor under a totality of the circumstances test. *Goldstein*, 218 F.3d at 348. This court assessed four factors in its analysis: "(1) the indicia of state involvement; (2) the functions carried out by the actor; (3) the nature of the relationship between the state and the actor; and (4) the powers and authorities that had been conferred upon the actor by the state." *Id.* The majority is correct that *Goldstein* states that the courts sometimes consider the state's analysis as a part of the totality of the circumstances test, although even the majority gives this requirement short shrift, addressing it only in a single footnote added to the last page of the opinion.

But *Goldstein* actually undercuts the majority's preferred approach here. The court in *Goldstein* applied a totality of the circumstances test. *Id.* at 342. This test is of course the same one rejected by the majority in favor of the crabbed two-pronged approach derived from *Ellyson* and *Jarrett*.

Moreover, the Virginia case law cited by the majority fails to support the majority's case. *Mier*, Maj. Op. at 17 n.10, is inapposite because it is factually distinguishable. *Mier v. Commonwealth*, 407 S.E.2d 342 (Va. App. 1991). In *Mier*, the court held that mall security guards were not public actors because their authority was limited to temporarily detaining apprehended shoplifting suspects. *Id.* at 346. But the guards in *Mier* enjoyed significantly less authority than Officers Slader and Costa. The guards drew their authority from Va. Code §18.2-105.1, a statute that solely permits the detention of suspected shoplifter for one hour pending the arrival of a law-enforcement officer, and Va. Code §18.2-105, repealed and replaced by §8.01-226.9, which exempts the detainer from civil liability. *Id.* at 345.

In *Coston*, the Court of Appeals of Virginia held that when a registered security officer is "engaged in a duty specifically granted by statute, that officer is a public officer or public employee." *Coston v. Commonwealth*, 512 S.E.2d 158, 159-160 (Va. App. 1999). In *Coston*, the security guard was acting pursuant to Va. Code § 19.2-74, which entitles a registered

following a test created for a distinguishable set of facts, I prefer a specific fact-based inquiry targeted at the authority granted by statute to, and its exercise by, armed private security guards, similar to the test used in Sixth and Seventh Circuits.

### III.

As explained above, I would conclude that Day satisfied his burden of establishing that the armed private security guards who detained and searched him must be deemed state actors. Turning, then, to the merits of the district court's suppression order, I conclude that the district court (1) erred when it suppressed Day's statement about the marijuana and when it suppressed the physical evidence itself, but (2) did not err in suppressing Day's statement regarding his possession of the handgun.[7]

---

security officer to issue summons. The court treated the officer as a private security guard because he acted pursuant to his duty "specifically granted by statute." The same reasoning applies to the instant case. Officers Costa and Slader acted pursuant to authority specifically granted by statute when they detained defendant Day for a *Terry* stop. Va. Code Ann. 9.1-146 ("A registered armed security officer of a private security services business while at a location which the business is contracted to protect shall have the power to effect an arrest for an offense occurring (i) in his presence on such premises.").

[7]There is some uncertainty in the record as to whether the district court intended to suppress the marijuana seized from Day under *Miranda*. In any event, it is settled that the exclusionary rule does not apply to physical evidence discovered as a result of a *Miranda* violation. *United States v. Patane*, 542 U.S. 630, 634 (2004); *U.S. v. Sterling*, 283 F.3d 216, 219 (4th Cir. 2002). Day does not contend otherwise. Rather, he argues that the marijuana was properly suppressed as the fruit of an unreasonable search under the Fourth Amendment. For the reasons stated in text, I reject this contention.

## A.

Officer Costa did not violate Day's *Miranda* rights when he asked him "if he had anything illegal on him[,]" J.A. 22, because the question was not part of a custodial interrogation. Law enforcement officers making an arrest must give *Miranda* warnings before conducting custodial interrogations. *Miranda*, 384 U.S. at 444. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* But *Miranda* warnings are unnecessary before questioning a suspect during a *Terry* stop. *United States v. Leshuk*, 65 F.3d 1105, 1108-09 (4th Cir. 1995). Here, Costa's question (put to Day in the initial moments of the latter's detention by the former) was merely intended to safeguard the situation during a *Terry* stop.

An individual is in custody "when, under the totality of the circumstances, a suspect's freedom from action is curtailed to a 'degree associated with formal arrest.'" *U.S. v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). The operative question is whether, viewed objectively, a reasonable man in the suspect's position would have understood that he was in custody. *Berkemer*, 468 U.S. at 422. Among the facts to be considered are "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *United States v. Weaver*, 282 F.3d 302, 312 (4th Cir. 2002).

In this circuit, an officer's use of a drawn weapon and/or handcuffs does not necessarily transform a *Terry* stop into an arrest. Further, even a complete restriction of liberty is valid under *Terry* if the restriction is brief. *United States v. Sinclair*, 983 F.2d 598, 602 (4th Cir. 1993) (holding that drug dealers were not in custody merely because law enforcement officers

drew their guns during a *Terry* stop as a reasonable safety precaution); *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989) (holding that a stop and frisk is not necessarily converted into an arrest when defendant was handcuffed prior to the pat down search).

Here, Day was not in custody for purposes of *Miranda* when he admitted, in response to Costa's question regarding whether he possessed "anything illegal," that he possessed marijuana. The place of the arrest suggests that it was merely a brief detention: defendant was outside his own car, in a public place; not inside the guards' car or at the police station. Only two guards and one car were present at the time of the detention. Further, the officers used their firearms and handcuffs for their own safety, just as in *Sinclair* and *Crittendon*. As the government notes, the incident started with a screaming match between multiple individuals, and the guards' actions were necessary and reasonable to safeguard the situation and ensure the public safety. *Terry*, 392 U.S. at 20 (permitting actions "reasonably related in scope to the circumstances which justified the interference in the first place."); *United States v. Hensley*, 469 U.S. 221, 235 (1985) (finding officers conducting *Terry* stops may "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.").[8]

---

[8]To be sure, some factors do militate in favor of a finding of custody. The officers commanded Day to "freeze" as they ran towards him. At least one gun was pointed at Day the entire time, and he was handcuffed and frisked. J.A. 22. The detention occurred in the middle of the night, more than one guard was present, and Day's liberty was severely restricted. J.A. 20-21, 31. These factors would make a reasonable person believe that he was not free to leave, but under Fourth Circuit precedent, shouting, guns, and handcuffs do not instantaneously transform the guards' stop into an arrest—instead, courts must analyze the totality of the circumstances. Ultimately, the circumstances here comprise a *Terry* stop-and-frisk and not *Miranda* custody. *U.S. v. Moore*, 817 F.2d 1105, 1108 (4th Cir. 1987) (collecting cases and concluding that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes).

As Day was not in custody for *Miranda* purposes in the earliest moments of his encounter with the officers, Day's admission during those moments that he possessed marijuana should not have been suppressed as the product of unwarned custodial interrogation.

### B.

Once Day admitted that he possessed marijuana, a reasonable law enforcement officer would have probable cause to arrest Day and to search his person incident to the arrest. *See U.S. v. Powell*, 886 F.2d 81, 83 (4th Cir. 1989), *abrogated on different grounds*, *U.S. v. Angle*, 230 F.3d 113 (4th Cir. 2000). Viewed objectively, as it must be, *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)), that is precisely what occurred here. Thus, Costa's search of Day's pants pocket was reasonable: it was fully supported by probable cause to arrest Day, and was incident thereto.

### C.

After Day admitted to possessing marijuana and after the marijuana had been seized, the *Terry* stop initiated by Costa and Slader ripened into a *de facto* arrest; i.e., custody. That is, after the officers secured the illegal substance, a critical aspect of the encounter shifted: its purpose. Before the drugs were secured, Costa and Slader acted to stabilize a potentially dangerous situation and to investigate the circumstances before them. But when they discovered that Day possessed illegal narcotics, their goal evolved into detaining Day until the local law enforcement arrived. This change in purpose, in combination with the passage of time, alters the custody analysis.[9] *See Weaver*, 282 F.3d at 312.

---

[9]Although the proper analysis is whether a reasonable man in the suspect's position would have understood that he was in custody, *Berkemer*, 468 U.S. at 422, it is telling that the local law enforcement officer testified that when he arrived, Costa and Slader held Mario Day "in custody." J.A. 45.

While Costa held Day in custody and awaited the arrival of local law enforcement officers, he questioned Day as to the reasons why he was in possession of the weapon. J.A. 24-25. This questioning indisputably qualifies as an interrogation, and as previously explained, Day was in custody during this period. Accordingly, I would affirm the district court's order suppressing the statements made by Day to officer Costa regarding his ownership and possession of the weapon.

IV.

In sum, Officer Costa essentially conducted a full blown investigation into the circumstances confronting him when he encountered Mario Day on July 5, 2008. The officer entered Day's vehicle to search it and to seize the handgun he had observed Day place on the floorboard. J.A. 21-22. He detained Day at gunpoint and handcuffed him. J.A. 22. He questioned him regarding Day's possession of "anything illegal," and upon learning that Day possessed marijuana, he searched Day's person and seized the marijuana, as any reasonable and respectable law enforcement officer would. *Id.* He then proceeded to question Day about the firearm. J.A. 24-25. All these acts were for the benefit of a potential prosecution of Day on any and all criminal offenses that might be laid against him. Virginia law made the collection of the disputed evidence possible. It is difficult to imagine how anyone but a law enforcement officer could have achieved these results.

It is undoubtedly true that the Fourth Amendment "does not provide protection against searches by private individuals *acting in a private capacity*," *Jarrett*, 338 F.3d at 344 (emphasis added). But that is not what the record here shows.

* * *

For the reasons stated, I would affirm in part and reverse in part the district court's order suppressing evidence and remand this case for further proceedings.